IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHRISTOPHER WEBSTER and
PATRICIA WEBSTER, husband and
wife,

        Plaintiffs,

  vs.                                          No. CIV 03-451 LFG/RHS

THE GLENS FALLS INSURANCE
COMPANY,

        Defendant.

## MEMORANDUM OPINION AND ORDER ON
## THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment [Doc. 7] and Plaintiffs' Motion for Summary Judgment [Doc. 11]. Both motions are fully briefed and ready for ruling. Oral argument is not necessary. For the reasons set forth below, each motion is granted in part and denied in part.

### Introduction

This is an insurance coverage dispute in which Plaintiffs Christopher and Patricia Webster ("the Websters") allege that Defendant Glens Falls Insurance Company ("Glens Falls"), which provides their homeowners' insurance, wrongfully refused to compensate them for a covered loss resulting from water and mold damage to an oil painting entitled "The Santa Fe Trail," by artist Frank

Tenney Johnson ("the painting").[1]

The Websters initially filed suit in state court, seeking a declaratory judgment that Glens Falls had an obligation to cover their losses on the painting, and also asserting a claim for punitive damages based on Glens Falls' bad faith in refusing coverage and in failing adequately to investigate the circumstances surrounding the damage. Glens Falls removed the case to federal court, citing diversity jurisdiction.

The facts are essentially undisputed, and both parties filed motions for summary judgment asking the Court to construe the insurance policy and determine whether Glens Falls is obligated thereunder to compensate the Websters for their loss. The parties also address the issue of bad faith, the Websters arguing that questions of fact exist on this issue precluding summary judgment, and Glens Falls arguing that it acted reasonably as a matter of law.

After careful consideration of the parties' submissions, the Court finds that the Websters are entitled to declaratory judgment that Glens Falls is obligated under the insurance contract to pay for the Websters' loss resulting from damage to the painting. The Court further finds that the Websters have not made out a case of bad faith against Glens Falls sufficient to go to the jury.

**Factual Background**

As stated earlier, the facts are basically undisputed. The Websters have been insured since February 1991 under an "Encompass Insurance Elite Universal Security Policy," which they purchased from Encompass Insurance's underwriter, the defendant Glens Falls Insurance Company.

---

[1] Frank Tenney Johnson (1874-1939) is an American artist who won fame and national repute as a Western artist, specifically for his oil paintings and illustrations of cowboys and Native Americans. His painting and Western scenes, especially his nocturnes, are highly prized by Western art collectors. *See*, William A. Karges Fine Art web site, www.kargesfineart.com.

The policy covers, among other things, tangible personal property, including the painting, located in the Websters' home.

For an additional premium, the Websters purchased "Blanket Fine Arts" coverage under the Scheduled Tangible Personal Property Endorsement to their policy. Both the general policy and the endorsement contain several exclusions to coverage. The dispute in this case centers on the policy's endorsements. The issue is whether the extensive exclusions of the general policy, or the more limited exclusions of the endorsement, govern the loss herein.

As noted above, the Websters own a oil painting entitled "The Santa Fe Trail," ca. 1928, by artist Frank Tenney Johnson. It is undisputed that at all material times this painting was covered by the policy and endorsement at issue in this case. The painting was kept in an underground storage area at the Websters' home in Santa Fe. In April-May 1996, the Websters removed the painting from the storage area and had it inspected and appraised by Steven Prins ("Prins"), a conservator, and Bernard Ewell ("Ewell"), an appraiser. Prins found that the painting was in poor condition, based on prior restoration and age. Because the painting was in need of restoration, Ewell set the painting's fair market value between $293,000 and $350,000.

After the 1996 inspection and appraisal, the painting was professionally rewrapped and stored, as follows:

> Prins, Webster and a number of day laborers (according to Webster) rewrap[ped] the item around the perimeter of an A.C.D. Concrete Systems, Canadian made, heavy gauge, composition, tubular concrete construction mold, 24" diameter ... The painting itself was sandwiched between heavy gauge plastic sheeting before it was rolled on the outside of the cylinder and, according to Prins, it was to be stored either on blocks or suspended.

[Report of Dena Hall, March 26, 2002, Ex. A to Dock. 8, at 2].

3

In fact, the concrete cylinder, with the plastic-sheeted painting wrapped around it, was suspended by metal strapping from the overhead support beams of a subterranean storage area accessed via a dirt-floored crawl space underneath the Websters' residence. Above the storage area was a brick patio. The painting remained stored in this place and manner from May 1996 until February 2002, when the Websters removed the painting from storage and discovered that it had sustained severe damage due to mold and mildew after water invaded the storage container. The Websters made a claim for their loss with Glens Falls in accordance with their insurance policy.

In March 2002, the Websters hired Appraiser Dena Hall ("Hall") to inspect the painting. She reported that, although a good attempt had been made to secure the painting and protect it from water and other types of damage, water nevertheless entered the secure wrapping and caused damage "of a sustained and lengthy nature." [Doc. 8, Ex. A, at 3]. It is unclear where the water came from and how it reached the painting in its suspended state. However, Hall, who examined the underground storage facility, noted in her report that it was clear that a great deal of water and debris had cascaded down over a crossbeam directly above the painting, and that other staining and water damage was evident to the support beams under the patio.

Hall further noted that, because the painting was rolled, the damage occurred in two vertical sections. Both sections sustained deterioration of the back canvas and large sections of mold, mildew and accretions on the surface, resulting in loss of surface pigment. Hall's opinion was that the damage occurred over a lengthy period of time. She stated, "This type of water intrusion combined with a broken seal to the plastic liner would have allowed moisture to enter the cylinder and remain within the plastic sheeting and create an environment wherein the entire backing and fabric of the painting itself would have deteriorated through time." [Doc. 8, Ex. A, at 4].

Shortly after Hall's inspection, in March 2002, the Websters asked Ewell, the appraiser who evaluated the painting in 1996, to examine it again. He found that "[i]t appears that the rolled canvas was subjected along the bottom (left side of the painting) to water damage and being in the microclimate of a plastic wrapping, mold growth extensively damaged the wet portion with the areas of the canvas and secondary support (lining) rotting away. " [Doc. 11, Ex. C, at 2]. He appraised the painting, in its condition at that time, at a fair market value of no more than $200,000.

On April 17, 2002, Glens Falls denied coverage for the loss, having earlier sent a letter to the Websters reserving all rights under the policy. In their denial letter, Glens Falls stated that the damage to the painting "is considered wear and tear and gradual deterioration" and they quoted from both the Fine Arts Endorsement portion of the policy as well as from the "tangible personal property" portion of the main policy. [Doc. 11, Ex. D].

On July 9, 2002, the Websters' attorney wrote to Glens Falls, requesting that it reconsider its decision denying coverage. On November 22, 2002, Glens Falls responded by sending a second denial letter, again relying on the wear and tear and gradual deterioration exclusions, and adding other exclusions from the main portion of the policy, including weather conditions, and poor workmanship, materials, or maintenance of the deck overlying the underground storage area. This suit followed.

### Standards for Summary Judgment

A summary judgment proceeding is appropriately used to cut through the allegations of the pleadings and to determine if there is a triable issue. Summary judgment will be granted when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins.

5

Co., 52 F.3d 1522, 1527 (10th Cir. 1995). The court does not decide the issues of fact, but rather determines if there is an issue that must be resolved at trial.

Summary judgment is appropriate only if there is insufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986). Thus, the Court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id., at 251-52, 106 S. Ct. at 2512. The Court, in considering a motion for summary judgment, examines the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing the motion. Foster v. Alliedsignal, Inc., 293 F.3d 1187 (10th Cir. 2002).

The construction of an insurance policy is a matter of law which can be decided on summary judgment. Winters v. Charter Oak Fire Ins. Co., 4 F. Supp. 2d 1288, 1291 (D.N.M. 1988); Adams-Arapahoe Joint Sch. Dist. v. Continental Ins. Co., 891 F.2d 772, 774 (10th Cir. 1989).

### Discussion

**A. Coverage Under the Policy**

In construing an insurance policy, the Court in a diversity case looks to the law of the forum state. If the state Supreme Court has not addressed the issue, the Court's duty is to determine, as best it can, how the issue would be resolved by the state's highest court, taking into account state court decisions, decisions of other states, federal decisions, and the general weight and trend of authority. Winters v. Charter Oak, *supra*, at 1291, 1293.

Certain principles apply in construing a contract of insurance. The words of the contract are given their ordinary meaning and, when there is an ambiguity, the test is not what the insurer

6

intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean. Ivy Nelson Grain Co. v. Commercial Union Ins. Co. of New York, 80 N.M. 224, 225, 453 P.2d 587, 588 (1969). An insurance contract must ordinarily be considered as a whole. If the policy is clear and unambiguous, the courts have no occasion to construe the terms thereof; however, if a policy may reasonably be construed in more than one way, it should be construed liberally in favor of the insured. Gray v. Int'l Serv. Ins. Co., 73N.M. 158, 386 P.2d 249 (1963).

Where the controversy concerns an exclusion to coverage, as in the present case, the burden is on the insurer to establish that the exclusion applies. Winters v. Charter Oak, *supra*, at 1291. "The insurer's interpretation, especially when it concerns an exclusion to the overall coverage, must be clearly expressed in the policy . . . The rules of contract construction are especially narrow when applied to the exclusionary provisions of insurance policies." Rummel v. Lexington Ins. Co., 123 N.M. 752, 759, 764, 945 P.2d 970, 977, 982 (1997). Insurers should expect that the exclusions drafted by them will be construed narrowly against them, and it is assumed that they calculate their premiums accordingly. Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co., 505 F.2d 989, 1003-04 (2d Cir. 1974).

1. Only the Exclusions Set Forth in the Endorsement Apply in This Case.

The main body of the policy in the present case includes a section providing insurance coverage for direct physical loss to all "tangible personal property" owned or used by any covered person, unless the loss is excluded under the "Losses We Do Not Cover" (*i.e.,* the exclusions) portion

of the policy.[2] The painting was undisputedly tangible personal property owned by the insureds and stored at the insureds' home. Thus, under the standard policy, it would have been insured.

The exclusions portion of the main policy can be summarized as follows. The company does not insure for loss to real property and tangible personal property:

(a) involving collapse;

(b) caused by freezing, thawing, pressure or weight of water or ice;

(c) to condominiums, cooperatives, or rental property;

(d) caused by: (1) wear and tear, aging, marring, scratching or deterioration, (2) inherent vice or latent defect, (3) rust, corrosion, mold, fungi, wet or dry rot, (4) smog, smoke from agricultural smudging or industrial operations, (5) settling, shrinking, etc. of pavements, patios, foundations, walls, floors, roofs, or ceilings, and (6) birds, vermin, insects, rodents or other animals;

(e) to covered property caused by any of the following: (1) weather conditions; (2) acts of decisions of governmental bodies; (3) faulty, inadequate or defective planning, zoning, design, workmanship, repair, construction, materials, or maintenance;

(f) cause by water damage, meaning (1) flood, surface water, etc., and (2) water below the surface of the ground, including water which seeps or leaks through a building, sidewalk, foundation or swimming pool;

(g) damage due to neglect of a covered person to use all reasonable means to preserve property at and after the time of a loss;

(h) involving intentional or criminal acts of a covered person;

(i) damage caused by war or warlike acts;

(j) damage arising out of a nuclear hazard;

(k) damage arising from power failure;

---

[2]The "Tangible Personal Property" section of the policy also provides that certain personal property including bank notes, securities, etc., are subject to "special limits," but this does not apply to the painting in this case. Another section lists tangible personal property not covered at all, including animals, motor vehicles, aircraft, business data, etc.; but again, this section is not applicable to the painting.

(l) caused by freezing of a plumbing, heating, air conditioning system.

The "Losses We Do Not Cover" section also includes language regarding "concurrent losses" and "ensuing loss."

Thus, if this exclusion portion of the main policy is not replaced by the exclusion portion of the endorsement, coverage would arguably be excluded under (d)(3) [rust, corrosion, mold, fungi, wet or dry rot], or (e)(1) [weather conditions], or (e)(3) [faulty, inadequate or defective planning, design, workmanship, repair, construction, materials, or maintenance], or under exclusion (f) [water damage, including water which seeps or leaks through a building, sidewalk, foundation, etc.].

It is undisputed that the "Scheduled Tangible Personal Property Endorsement," which provides "Blanket Fine Arts Coverage" for up to $150,000, applies to the painting at issue here. The specific exclusions listed in this endorsement are: (1) wear and tear, gradual deterioration or inherent vice; (2) insects or vermin; (3) war; (4) nuclear hazard; (5) any losses to fine arts caused by breakage or by the process of repairing, restoration or retouching; and (6) certain losses caused to stamps, trading cards or coin collections. The parties agree that the only exclusions in the endorsement which are potentially applicable in this case are wear and tear, gradual deterioration, and inherent vice.

Glens Falls argues, however, that all of the exclusions for tangible personal property, as set forth in the main body of the policy, also apply to limit coverage in this case, in spite of the existence of the Fine Arts Endorsement. The Court disagrees.

It is generally true that an insurance policy should be construed, whenever possible, so as to give effect to every part of the contract. King v. Travelers Ins. Co., 84 N.M. 550, 555, 505 P.2d 1226, 1231 (1973). However, it is not always possible to so construe a policy and where irreconcilable conflicts exist, the Court must construe the policy in a light most favorable to the

insured. Id.

"[T]he language of an endorsement attached to a policy controls where there is an irreconcilable conflict between the body of the policy and an endorsement." Ivy Nelson Grain Co., *supra*, 80 N.M. at 226; Lax v. Fid. & Cas. Co. of New York, 74 N.M. 123, 125, 391 P.2d 411, 413 (1964). *See also*, Western Heritage Ins. Co. v. Cava Trucking, Inc., 991 F.2d 651, 654 (10th Cir. 1993) (applying New Mexico law) ("Where the terms of an insurance policy and a provision in a rider conflict, the rider prevails"); and Farmers Ins. Exchange v. Ledesma, 214 F.2d 495, 498 (10th Cir. 1954) (applying New Mexico law):

> It is the general rule that an endorsement or rider attached to an insurance policy becomes and forms a part of the contract; that the policy and the endorsement or rider shall be construed together; and that where the provisions in the body of the policy and those in the endorsement or rider are in irreconcilable conflict the provisions contained in the endorsement or rider will prevail over those contained in the body of the policy.

*See also*, 4 Eric Mills Holmes, Holmes' Appleman on Insurance § 20.1 (2d ed. 1998):

> The endorsement is considered to supersede the printed formal policy provisions because it is generally perceived that the endorsement is a more complete recital of the intention of the parties. Where the endorsement expressly provides that it is subject to all terms, limitations, and conditions of the policy, it does not abrogate or nullify any provision of the policy unless it is so stated in the endorsement. However, endorsements often are issued to specifically grant certain coverage or remove the effect of particular exclusions. Thus, such an endorsement will supersede the terms of the exclusion in question.

The Court finds that there is an irreconcilable conflict between the provisions of the main policy and the endorsement, and it construes the conflict in favor of the insured. As set forth above, the main policy's exclusionary clauses are quite extensive. They cover causes ranging from wear and tear, marring and scratching, rust, mold, fungi, smog, smoke from agricultural smudging, birds,

vermin, insects, collapse, weather freezing of the plumbing system, and defective planning, siting, design, workmanship or maintenance of any part of the property. The endorsement, on the other hand, provides fewer, indeed, only a small handful, of exclusions, including damage caused by wear and tear, insects or vermin, war, nuclear hazard, and, with regard to fine arts, losses caused by repairing, restoration, retouching, or breakage. Thus, if the endorsement exclusions replace the main policy exclusions, there is more coverage for the Websters as there would be fewer possible exclusions.

Glens Falls interprets the contract to read that all exclusions in the main policy apply in this case, in addition to the exclusions in the Fine Arts Endorsement. Most of the exclusions in the endorsement also appear in the main policy; however, there are some additional exclusions in the endorsement, specifically applicable to fine arts, which are not found in the main policy. Thus, if the exclusions of the main policy and the endorsement are both operative, then the Websters purchased an endorsement which subjected their fine art to less coverage, *i.e.*, more exclusions than would have been the case had they not purchased it.

The Websters paid an additional premium for the endorsement. If the Court were to accept Glens Falls' interpretation, it would have to conclude that the Websters paid more for less coverage. Even if this is what Glens Falls intended in selling the endorsement to the Websters, it cannot be what the Websters had in mind. "[W]hen there is ambiguity, the test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean." Ivy Nelson Grain Co., *supra*, 80 N.M. at 225. No reasonable person in the Websters' position would have increased their premium only to have less protection and more exclusions from coverage.

11

The Court finds that an ambiguity exists by virtue of the fact that the main policy and its endorsement contain differing sets of exclusions, without explanation. Whether an insurance policy is ambiguous is a question of law to be determined by the court, and a court will find ambiguity only if the contract is "reasonably and fairly susceptible of different constructions." Western Heritage Ins. Co. v. Cava Trucking, *supra,* 654, *citing* Richardson v. Farmers Ins. Co. of New York, 112 N.M. 73, 811 P.2d 571, 571 (1991); Levenson v. Mobley, 106 N.M. 399, 744 P.2d 174, 176 (1987). "If ambiguities cannot be resolved by examining the language of the insurance policy, courts may look to extrinsic evidence such as the premiums paid for insurance coverage . . . ." Rummel v. Lexington Ins. Co., *supra*, 123 N.M. at 759.

Construing this ambiguity, the Court finds that Plaintiffs' interpretation is the more sensible one, under the facts of this case. A reasonable person in the Websters' position would expect that they were getting additional coverage, not less, for an additional premium. The Court concludes, therefore, that the limited exclusions listed in the endorsement were intended to replace, not to supplement, the extensive exclusions listed in the main policy. It is more reasonable to conclude that the benefit purchased by the Websters was a reduction in the kinds and numbers of coverage exclusions.

It is not necessary that the endorsement state specifically that its listed exclusions are meant to replace those of the main policy, if an opposite conclusion would cause an illogical result and violate the insureds' reasonable expectations. As noted above, there is no explicit statement in the endorsement to the effect that it is "subject to all terms, limitations, and conditions of the policy," *see*, Holmes' Appleman on Insurance, *supra*; and therefore it is not necessary for the endorsement to specifically state that its exclusions supersede those of the main policy.

This conclusion does not violate the principle that an insurance contract should be read in its entirety, as a single integrated document. The endorsement is not a separate contract, but its exclusionary terms override the exclusionary terms of the main policy. Ivy Nelson Grain Co., *supra*; Western Heritage Ins. Co. v. Cava Trucking, Inc., *supra*; Farmers Ins. Exchange v. Ledesma, *supra*, at 498 (the policy and endorsement are to be construed together, except that where they contain irreconcilably conflicting provisions, the endorsement prevails).

Defendant cites repeatedly to a Pennsylvania case, Rorer Group, Inc. v. Insurance Co. of North America, 440 Pa. Super. 69, 655 A.2d 123 (Pa. Super. 1995), to support its argument that the main policy exclusions apply, even in the face of an endorsement containing its own exclusions. The Court does not find this case persuasive, in light of the New Mexico and Tenth Circuit authority noted above.

### 2. The Loss in This Case is Not Excluded Under the Policy.

Having determined that the exclusions set forth in the endorsement, rather than those in the main body of the policy, apply in this case, the Court turns to those exclusions to determine whether coverage exists for damage to the painting in this case.

The causes listed in the endorsement which are arguably applicable in this case include exclusions for direct physical loss caused by "wear and tear," "gradual deterioration," or "inherent vice" of a fine art object.[3] The two appraisers who examined the painting after it was removed from storage in 2002 reported that the painting was exposed to water while wrapped in plastic, and the

---

[3]The parties are in agreement that none of the other exclusions listed in the endorsement are applicable, including loss caused by insects, vermin, war, nuclear hazard, the processes of restoration, or breakage.

13

microclimate which was thereby created allowed mold and mildew to grow, causing rotting of the lining and loss of surface pigment. The painting was stored in the plastic sheeting for over five and a half years, and at least one of the appraisers who inspected it in 2002 was of the opinion that the water exposure and damage occurred over a lengthy period of time.

a. Wear and tear

The Court cannot agree with Glens Falls that this sort of damage constitutes "wear and tear." That term is not defined in the policy, but it has been judicially defined in the context of insurance coverage as follows:

> construing the words 'wear and tear' in their everyday common usage, we are convinced that the words 'wear and tear' mean simply and solely that ordinary and natural deterioration or abrasion which an object experiences by its expected contacts between its component parts and outside objects during the period of its natural life expectancy.

Cyclops Corp. v. Home Ins. Co., 352 F. Supp. 931, 935 (W.D. Pa. 1973). *See also*, Sentinel Mgmt. Co. v. New Hampshire Ins. Co., 563 N.W.2d 296, 300 (Minn. App. 1997): "'Wear and tear' is the process of ordinary or natural deterioration . . . To be excluded wear and tear, damage must result from a fixed attribute of the damaged property . . . [in combination with] expected normal occurrences."

The damage that occurred to the painting in this case was not ordinary wear and tear. A painting's expected use is to be displayed or stored, and the owners of a valuable oil painting might reasonably expect, in the ordinary course of events, that it could come into contact with potentially damaging sunlight, dust, and framing materials, and that it would be subject to the usual strains of handling, framing, and mounting, including fingerprints, mild abrasions, and so on. But the lengthy

14

exposure to water that occurred in this case while the painting was encased inside plastic wrapping, was not the kind of "expected contact with an outside object" or an "expected normal occurrence" that a valuable oil painting could reasonably encounter over its natural life expectancy.

As the Websters point out, the painting had already sustained some damage over the course of its 68-year life between 1928 and 1996, but nothing comparable to the significant damage incurred over the five-and-a-half-year span between 1996 and 2002. This supports their argument that ordinary wear and tear to a oil painting does not include damage by large areas of mold and mildew. The Court agrees with the Websters' statement that "The ordinary and reasonable use of a painting does not include exposure to a significant amount of water." [Doc. 11, at 11]. The Court finds that the damage sustained by the painting was not caused by "wear and tear," and this exclusion is therefore not applicable under the facts of this case.

### b. Gradual deterioration

Glens Falls argues also that the endorsement's exclusion for "gradual deterioration" applies to preclude coverage for the damage to the painting. As was the case with "wear and tear," the term "gradual deterioration" is not defined in the policy.

The court in Cavalier Group v. Strescon Indus., Inc., 782 F. Supp. 946 (D. Del. 1992) found that the word "deterioration" as used in an insurance policy was ambiguous and thus construed the term in the light most favorable to the insured. The insured in that case argued, *inter alia*, that the loss (to concrete balconies in an apartment building) resulted not from "ordinary and natural causes but in a faster than anticipated time frame . . . ." Id., at 955. The court noted that the ordinary and usual meaning, that is, the dictionary definition, of the word deterioration "incorporates the notion of *gradual* impairment. In this case the balconies worsened in condition over time. While the

15

condition could be considered gradual in the sense that it took years to develop, it was not gradual in the sense that plaintiffs allege it occurred much faster than would normally be expected [emphasis in original]." Id., at 955-56.

The same is true in the present case. While the painting undoubtedly "deteriorated" in the ordinary sense of that word, it did not deteriorate in the natural way but rather was impaired by an unanticipated event, *i.e.*, exposure to water and resulting mold damage. And while the exposure and damage occurred over a five-and-a-half year period, the deterioration cannot be said to be "gradual," as a painting does not normally grow mold and sustain such damage in such a short time, absent something outside the "ordinary and natural causes."

Plaintiffs compare the relatively minor deterioration suffered by the painting between 1928 and 1996 with the significant damage occurring after the water exposure began, as support for their argument that he deterioration between 1996 and 2002 was not "gradual." The Court finds the Websters' argument persuasive. The term "gradual deterioration" as used in this policy is, at the least, ambiguous, and the Court construes it in favor of coverage, as it is bound to do. Gray v. Int'l Serv. Ins. Co., *supra*.

### c. Inherent vice

Finally, it cannot be said that the damage to the painting in this case was caused by an "inherent vice." Again, this term is not defined in the policy. However, courts considering it have noted that the inherent vice exclusion refers to damage "arising from an inherent defect or tendency of the insured property"; that is, "loss or deterioration which arose solely from a principal decay or corruption inherent in the subject insured or from its proper vice, *i.e.*, fruit rots, flour heats, or wine sours." Harmon v. Safeco Ins. Co. of America, 24 Kan. App. 2d 810, 814, 954 P.2d 7, 10 (1998).

16

"'Inherent vice' is defined as 'any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time.'" Archer-Daniels-Midland Co. v. Phoenix Assurance Co. of New York, 975 F. Supp. 1129, 1136 (S.D. Ill. 1997). A loss caused by inherent vice is one which "would happen without the intervention of any fortuity or chance occurrence, and was inevitable . . . ." Merrimack Mut. Fire Ins. Co. v. McCaffree, 486 S.W.2d 616, 617 (Tex. Civ. App. 1972). "The term 'inherent vice' . . . does not relate to an extraneous cause but to a loss entirely from internal decomposition or some quality which brings about its own injury or destruction." Petrolia Ins. Co. v. Everett, 719 S.W.2d 639, 640 (Tex. App. 1986).        The loss in this case was not caused "entirely from internal decomposition," an "existing defect" or an inherent quality of the canvas, linen, or oils that "brings about its own injury or destruction," as when fruit rots or wine sours. Rather, the damage resulted from an extraneous cause – *i.e.*, water entering the plastic covering and setting up conditions whereby mold and mildew could grow and eat away at the materials. This is not a natural or inevitable occurrence, arising solely from native qualities of oil paintings. Paintings do not by their inherent nature inevitably decompose, at least not over the course of five or six years, without the intervention of an accidental or otherwise unpredictable occurrence.

The Court therefore finds that the Websters' loss was not caused by an "inherent vice" of their insured property, and this exclusion is not effective to avoid coverage.

None of the three potential exclusions set forth in the endorsement being applicable, the Court finds that the Websters are entitled to a declaratory judgment which provides coverage under the

Glens Falls policy for the loss to their painting.[4]

### B. Bad Faith

In addition to a declaration that they are entitled to coverage, the Websters seek punitive damages based on Glens Falls' alleged bad faith in refusing coverage for "frivolous or unfounded" reasons, and for failing to conduct an adequate investigation. [Complaint, Doc. 1, Ex. A, at ¶ 13]. The Websters argue that there are issues of fact regarding these matters, precluding summary judgment. The Court does not agree and finds, as a matter of law, that Glens Falls did not act in bad faith.

"To assess punitive damages for breach of an insurance policy there must be evidence of bad faith or malice in the insurer's refusal to pay the claim." United Nuclear Corp. v. Allendale Mut. Ins. Co., 103 N. M. 480, 485, 709 P.2d 649, 654 (1985). In order to constitute bad faith, an insurer's failure to pay a claim must be for frivolous or unfounded reasons. Id.; Gallegos v. Citizens Ins. Agency, 108 N. M. 722, 730, 779 P. 2d 99, 107 (1989).

> "Unfounded" in this context does not mean "erroneous" or "incorrect"; it means essentially the same thing as "reckless disregard," in which the insurer "utterly fail[s] to exercise care for the interests of the insured in denying or delaying payment on an insurance policy" . . . It means an utter or total lack of foundation for an assertion of nonliability – an arbitrary or baseless refusal to pay, lacking any arguable support in the wording of the insurance policy or the circumstances surrounding the claim.

Jackson Nat'l Life Ins. Co. v. Receconi, 113 N.M. 403, 419, 827 P.2d 118, 134 (1992).

Although the Court rejects Glens Falls' interpretation of the insurance policy's exclusionary

---

[4] Having found that the loss in this case is attributable exclusively to a covered cause, the Court has no occasion to consider the parties' contentions with regard to "ensuing loss," the "anti-concurrent cause" provision, or the "efficient proximate cause" doctrine.

terms, it cannot say that the company's position was frivolous, based on malice, nor that it represents "an utter or total lack of foundation." To the contrary, there are exclusion in the main policy that may fully support Glens Falls' position. Indeed, the Court's ruling that the Websters are entitled to coverage in this situation is based on ambiguity, both in the interpretation of the competing sets of exclusions and in the meaning of terms such as "deterioration." The existence of an ambiguity means that the insurance contract is "reasonably and fairly susceptible of different constructions." Western Heritage Ins. Co. v. Cava Trucking, Inc., *supra*, at 654.

The Court finds that Glens Falls' decision regarding coverage was not completely unfounded or frivolous. Glens Falls represents that it obtained a coverage opinion from counsel before it made the decision to refuse coverage to the Websters, and that it supplied this 13-page analysis to the Websters as part of its initial disclosures. The Websters do not dispute this. The company's action in obtaining a coverage opinion indicates that it was acting prudently in considering the Websters' claim.

Plaintiffs argue that Glens Falls acted in bad faith not only in denying coverage, but also in failing to conduct an adequate investigation before relying on the exclusions, as set forth in the main policy, dealing with water and weather conditions. Having found that the main policy exclusions are not applicable in this case, any such alleged failure is immaterial. And with regard to the three endorsement exclusions – wear and tear, gradual deterioration, and inherent vice – no substantial factual investigation was necessary, as the determination principally called for a legal interpretation of the meaning of contract terms. The Court finds that Glens Falls acted reasonably, if erroneously, in relying on its attorney's opinion, and there is no basis for a bad faith claim in this case.

**Order**

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment [Doc. 11] is granted in part, to the extent it seeks a declaration that Defendant is obligated to pay for the Plaintiffs' loss resulting from damage to the Painting in accordance with the policy; and it is denied in part, to the extent it seeks a ruling that Defendants acted in bad faith;

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment [Doc. 7] is denied in part, to the extent it seeks dismissal of Plaintiffs' claim for insurance coverage; and it is granted in part, to the extent it seeks dismissal of Plaintiffs' claim for bad faith refusal to provide coverage.

*signature*
Lorenzo F. Garcia
Chief United States Magistrate Judge