IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHRISTOPHER WEBSTER
and PATRICIA WEBSTER,
husband and wife,

               Plaintiff,

    vs.                                       CIVIL NO.  03-451 LFG/RHS

THE GLENS FALLS
INSURANCE COMPANY,

               Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## CROSS MOTIONS ON MEASURE OF DAMAGES

THIS MATTER is before the Court on the parties' cross-motions for summary judgment. Defendant, The Glens Falls Insurance Company ("Glens Falls") filed its Motion for Summary Judgment Concerning Measure of Damages Against Plaintiff [Doc. 21].  Plaintiff, Christopher Webster and Patricia Webster ("Websters") filed their Motion for Summary Judgment Concerning Measure of Damages [Doc. 30].  Both motions are fully briefed.  The Court has considered the respective motions, response and replies and determines that oral argument is not necessary.  In addition, the Court addresses and denies Plaintiffs' Motion to Strike in Part Defendant's Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment [Doc. 37].

### Background

This lawsuit arose out of a dispute concerning insurance coverage.  The Websters owned an oil painting entitled "The Santa Fe Trail" ca. 1928, by famed western artist Frank Tenney Johnson.[1]

---

[1]Frank Tenney Johnson (1874-1939) is an American artist who won fame and national repute as a Western artist, specifically for his oil paintings and illustrations of cowboys and Native Americans.  His

This painting was stored in a secret, underground chamber at the Websters' home in Santa Fe.  The storage area was accessed via a trapdoor in their residence through a dirt crawlspace, which dropped into a small subterranean room located beneath the Websters' exterior outdoor patio.  The painting was professionally stored by being sandwiched between heavy gauge plastic sheeting and rolled on the outside of a concrete cylinder which was, in turn, suspended on overhead hangers, underneath support beams in the top of the storage area.

In 1996, Websters removed the painting from the storage area and had it inspected and appraised by Steven Prins ("Prins"), a conservator, and Bernard Ewell ("Ewell").  Prins found that the painting was in poor condition, based on prior restoration and age.  Because the painting was in need of restoration, Ewell set the painting's fair market value between $293,000 and $350,000.[2]  After the inspection and appraisal, the painting was returned to the Websters' subterranean storage area, wrapped as previously indicated and stored.

It was not until 2002 that the painting was again removed.  There was evidence of water damage in the overhead beams, and moisture had penetrated the painting's wrapping and damaged the painting itself.  The Websters discovered severe damage to the painting due to mold and mildew after water invaded the storage container.  Websters hired appraiser Dena Hall ("Hall") to inspect the painting.  Hall reported that, although a good attempt was made to secure the painting and protect it from water and other types of damage, water nevertheless entered the secure wrapping and caused damage "of a sustained and lengthy nature" (Doc. 8, Ex. A, p. 3).

---

paintings and Western scenes, especially his nocturnes, are highly prized by Western art collectors.  *See* William A. Karges Fine Art web site, www.kargasfineart.com.

[2]The $293,000 was the value of the painting in its deteriorated condition.  If restored, it would have the upper value of $350,000.  (Doc. 21, Ex. C, p. 2).

Because the painting was rolled, the damage occurred in two overlapping vertical sections. Both sections sustained damage due to deterioration of the painting's back canvas; similarly, the painting as a whole was damaged due to large sections of mold, mildew and accretions on the surface, resulting in loss of surface pigment. Hall's opinion was that the damage to the painting occurred over a lengthy period of time. She stated, "This type of water intrusion combined with a broken seal to the plastic liner would have allowed moisture to enter the cylinder and remain within the plastic sheeting and create an environment where the entire backing and fabric of the painting itself would have deteriorated through time." (Doc. 8, Ex. A, p. 4).

Websters had Ewell, the painting's original appraiser, evaluate the painting again. He too found that "[i]t appears that the rolled canvas was subjected along the bottom (left side of the painting) to water damage and being in the microclimate of a plastic wrapping, mold growth extensively damaged the wet portion with the areas of the canvas and secondary support (lining) rotting away." (Doc. 11, Ex. C, at 2). Ewell appraised the painting, in its condition at that time, at a fair market value of no more than $200,000.

In November 2002, Websters authorized South Coast Fine Arts Conservation Center to perform restoration work on the Tenney Johnson painting in an effort to repair its damage. In an effort to repair and/or restore the painting, Websters paid South Coast Fine Arts Conservation $22,250. Subsequent to the repair and restoration attempts, Ewell again inspected the painting and determined that with the repair and restoration, the painting had an appraised fair market value of $225,000. Ultimately, Websters sold the Tenney Johnson painting on an Internet on-line auction for collectibles for $110,250, less than half of the painting's fair market value.[3]

---

[3]The sales price obtained plays no role in the Court's evaluation. The value is based on fair market value rather than the amount recovered by the sale. So, too, the original purchase price paid by the Websters

The Websters were insured under a homeowners policy issued by Glens Falls.  There was a dispute whether the painting was covered under the main policy or under a separate "Blanket Fine Arts" endorsement for which Websters paid an additional premium.  By prior Memorandum Opinion and Order [Doc. 20], the Court found that the damage to the painting was a covered loss and that the painting was covered under the Blanket Fine Arts endorsement which superseded and replaced the exclusions under the Websters' main policy.  Further, the Court found that this was not an excluded loss under the provisions of the Blanket Fine Arts endorsement. ( Id.)

Subsequent to the Court's issuance of its Memorandum Opinion and Order, the parties were still not able to resolve their dispute concerning the applicable measure of damages to which the Websters are entitled.  Thus, the remaining issue before the Court is a determination of damages under the endorsement provisions applicable to this loss.  Both Websters and Glens Falls agree that material facts are not in dispute and that the Court can resolve this matter summarily without the need for a trial.

### Standards for Summary Judgment

A summary judgment proceeding is appropriately used to cut through the allegations of the pleadings and to determine if there is a triable issue.  Summary judgment will be granted when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The court does not decide the issues of fact, but rather determines if there is an issue that must be resolved at trial.

---

for the painting had no bearing on the Court's analysis.  Thus, Plaintiffs' motion to strike this portion of Defendant's reply in support of its motion for summary judgment is denied as moot.

Summary judgment is appropriate only if there is insufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  Thus, the Court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52, 106 S. Ct. at 2512.  The Court, in considering a motion for summary judgment, examines the factual record and the reasonable inference therefrom in the light most favorable to the party opposing the motion.  Foster v. Alliedsignal, Inc., 293 F.3d 1187 (10th Cir. 2002).

The legal standard does not change when parties file cross motions for summary judgment. Each party still carries the burden of establishing a lack of a genuine issue of material fact and entitlement to judgment as a matter of law.  Atl. Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1148 (10th Cir. 2000).

## Analysis

The relevant policy language reads as follows:

SCHEDULED TANGIBLE PERSONAL PROPERTY ENDORSEMENT

Tangible Personal Property - Limit of Liability

Loss Settlement:  Covered property loses are settled as follows:
1.       *Fine Arts - We will pay the amount shown for each scheduled article which is agreed to be the value of the article.*
         In case of loss to a pair or set, we agree to pay you the full amount of the set as shown in the schedule and you agree to surrender the remaining article or articles of the set to us.

2.       Postage Stamps or Rare and Current Coin Collections

                              *     *     *
3.       *Other Property*

5

a.  *The value of the property insured is not agreed upon* but will be ascertained at the time of loss or damage.  We will pay an amount not exceeding the smallest of:

> (1) *The amount that we could reasonably be expected to have the property repaired to its condition immediately prior to loss;* or

> (2)  The amount for which we could reasonably be expected to replace the article with one substantially identical to the article lost or damaged; or

> (3)  *The amount of insurance specified in the Coverage Summary for the property;* or

> (4)  The actual cash value (with deduction for depreciation) if the actual repair or replacement is not completed;

b.  If the Schedule indicates that "Stated Value Applies" to an item:

> (1)  For total losses to articles, . . . we will pay the stated value of the article as shown in the Schedule.

> (2)  For partial losses to articles, . . . we will pay no more than the stated value of the article as shown in the Schedule.  We will also apply the following in the settlement of a partial loss:

> *         *         *

> (b)  Loss to a Pair, Set or Parts - Jewelry and Fine Arts.  In case of a partial loss to a pair, set or parts, if you agree to surrender the remaining article or articles of the pair, set or parts to us we agree to pay you the stated value of the pair, set or parts.  If you do not surrender the remaining article or articles of the pair, set, or parts we will pay the difference between stated value of the article before the loss and the actual cash value of the article afer the loss.

(Doc. 21, Ex. A, emphasis added).

Pursuant to the Court's prior Memorandum Opinion, the Websters' loss is governed by this endorsement. Thus, Glens Falls' limits of liability are set out in this section. First, if the parties had agreed on the value of the article, Glens Falls was obligated to pay the insured the agreed-upon value. It is undisputed that there was no such agreement.[4] Websters also argue that the value "[C]ould be 'on file with the company' in its 'descriptions and/or appraisals' referenced in the Endorsement." (Motion, Doc. 30, pp. 5 and 6). However, in its response to the motion, Glens Falls noted, "[a] recent search by Glens Falls revealed that no such descriptions or appraisals exist." (Doc. 36, Response, p. 3). Thus, there is no credible evidence submitted which demonstrates that the parties ever agreed upon a value under Paragraph 1 of the Loss Settlement.

Paragraph 2 of the Loss Settlement is not applicable as this paragraph relates only to postage stamps or rare and current coin collections. However, Paragraph 3 "Other Property" is applicable. This section of the Loss Settlement endorsement provides that when the value of the insured property is not agreed upon, it will be ascertained at the time of loss or damage, and Glens Falls' obligation is to pay an amount not exceeding the smallest of "The amount that we could reasonably be expected to have the property repaired to its condition immediately prior to its loss . . . ."

Glens Falls argues that since the painting was repaired at a cost of $22,250, and that is the smallest amount authorized under the four sub-categories of "Other Property," the Court should award no more than $22,250.

Websters, on the other hand, argue that the Frank Tenney Johnson painting was a unique, one-of-a-kind work and simply cannot be repaired or restored to its condition prior to the loss. Indeed, Websters submit the Affidavit and appraisal of appraiser Ewell who states, "While visually

---

[4]Indeed, Plaintiffs state "[T]he Schedule does not identify the Painting separately with an agreed upon value. Ex. A, Schedule." (Doc. 30, Motion, p. 5, n. 1).

it [the painting] was much as it had been [before the repair], it nonetheless was, and always would be, compromised in the eyes of the art market, [by] both dealers and buyers." (Doc. #30, Ex. C, p. 2). The Ewell appraisal makes clear that while the repairs resulted in the painting being much as it had been before the repairs, it is equally clear that the damage and subsequent restoration adversely affected the painting's value. When an insurer attempts to repair or rebuild under "repair, restore or replace" clause, the insurer is obligated to return the damaged property to substantially its original condition so as to render it as valuable as it was before the damage occurred, Appleman, Insurance Law and Practice, Vol. 6, § 3833 at 373-77 and n. 27.05 (1972)(under clauses limiting liability of an insured to the cost of suitable repair or replacement, "the cost of repairs and replacement will not operate as a limitation of liability unless the automobile is restored to its previous condition, and the courts have, where the repairs have failed to fully restore the vehicle to its former condition, either allowed recovery for the difference between the fair cash value before and after the accident or have awarded the diminution in value in addition to the cost of repair.").

Thus, simply awarding the cost of restoration would not adequately compensate Websters for the insured loss. It is clear from the Ewell appraisal that the painting had a fair market value of $293,000 prior to the loss and, subsequent to the loss but prior to the restoration, its value dropped to $200,000. The restoration increased the painting's value to $225,000, but the loss suffered is the difference between the painting's original value of $293,000 and its restored value of $225,000, or a total of $68,000.

Had Websters not sought to repair the painting, Paragraph 4 of the "Other Property" provisions would have been applicable. That is, Websters would have recovered the actual cash value (with deduction for depreciation) if the actual repair or replacement is not completed. The actual cash value of the painting prior to the loss was $293,000, and the painting's actual cash value after

8

the loss was only $200,000. Thus, the diminished cash value of the painting was $93,000, and under Paragraph 4 of the "Other Property" section of the endorsement, Webster would have been entitled to $93,000.

Websters instead opted to undertake repairs and restoration to enhance the painting's value and to attempt to return the property to its condition immediately prior to the loss. Their expenditure of $22,250 towards restoration resulted in an increase of the value of the unrestored painting from $200,000 to $225,000. Websters should be allowed recovery for the difference between the fair cash value of the painting before the loss and the diminution in value after the loss in addition to the costs of repair. Using those figures, the painting had a value of $293,000 before the loss, and a value of $225,000 after restoration, for a difference of $68,000 representing the diminished value. The costs of repair were $22,250. Thus, the actual loss to Websters is $90,250--a figure which is smaller than the $93,000 that the Websters would have otherwise been entitled to under Paragraph 4.

For the foregoing reasons, the Court concludes there is no genuine issue as to any material fact and that both cross motions for summary judgment must be granted in part and denied in part, with the result that Websters are entitled as a matter of law to an award of $90,250.

IT IS THEREFORE ORDERED that:

(1) Defendant Glens Falls' motion for summary judgment is granted in part and denied in part as described herein;

(2) Plaintiffs Websters' motion for summary judgment is granted in part and denied in part as described herein; and,

(3) Plaintiffs Websters' Motion to Strike in Part Defendant's Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment [Doc. 37] is denied as moot.

IT IS FURTHER ORDERED that as this Memorandum Opinion and Order resolves all remaining matters in this litigation, this case is dismissed with prejudice.


Lorenzo F. Garcia
Chief United States Magistrate Judge

10